## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIMINAL ACTION NO. V-05-151** |
| | § | |
| **PAUL GRANT** | § | |

### ORDER

Pending before the Court is Defendant Paul Grant's Motion to Suppress (Dkt. # 49). After considering the motion, response, and the applicable law, the Court is of the opinion that the motion should be granted.

### Facts

On May 25, 2005, Bee County Sheriff's Deputy Robert Meakins was patrolling U.S. Highway 59 east of Beeville with his drug-sniffing dog Heidi. At approximately 10:30 p.m.,[1] he observed a pickup truck traveling eastbound. He began following the truck "to observe the driver's driving habits."[2] After following the truck for several miles, Meakins observed the driver cross the center line into the westbound lane.[3] Meakins stopped the truck at approximately 10:37 p.m. for failing to maintain a single lane of traffic. Paul Grant ("Defendant" or "Grant") was driving the truck and his co-defendant, Derrick Robinson, was in the passenger seat.

Meakins obtained Defendant's driver's license, insurance, and registration. He instructed the Defendant to step out of the vehicle and directed him to stand behind the truck, leaving Robinson inside. Once safely at the rear of the truck with Grant, Meakins radioed for backup and called in

---

[1] The Court is using the time stamps from the video taken from Meakins' patrol vehicle.

[2] Dkt. # 52, p. 1.

[3] Defendant disputes this fact, which the Court will discuss *infra*. There is also no discussion by the Government of what, if anything, ever came of the traffic violation that prompted the stop in the first place.

Defendant's driver's license number to the dispatcher.  Meakins questioned Grant about where he was coming from and the nature of his trip.

Grant stated that he and Robinson had driven to McAllen to buy a vending truck for the purpose of selling tacos to co-workers at the construction site where they worked in South Carolina. He told Meakins that he had placed a $200 deposit on the vending truck that was being sold for $25,000. Grant informed him that he was Robinson's uncle and that they were related on Robinson's mother's side.  Meakins inquired if Grant had been arrested and he responded only for a suspended license. Meakins believed that Grant was acting nervous because he repeatedly stretched his arms and yawned.

At approximately 5 minutes into the stop when both men were still standing at the rear of the truck, Meakins asked Grant "what do you have in the back of there," motioning to the bed of the truck.  Grant responded that he had nothing back there and moved to open the tailgate for the officer to look.  Meakins said "that's alright, that's alright," indicating he did not want to look at that time. Meakins asked if it was "empty," and Grant said he had his clothes, toothpaste, and stuff back there. Grant told Meakins "you can go ahead and look back there."  This exchange formed the entire basis of Meakins' belief that Grant had given him general consent to search the truck.

Meakins approached Robinson at the passenger side of the vehicle and obtained his driver's license. Meakins posed the same questions to Robinson about the nature of their trip and his arrest record.  Robinson gave the same story about driving to McAllen to purchase a taco truck.  Meakins felt Robinson also exhibited nervous behavior because of "the manner in which he spoke and in the way he moved around the truck."[4]  Robinson's driver's license was reported to dispatch.  At approximately 7 minutes into the stop, Deputy Hinds arrived on the scene.  Both officers continued

---

[4]  Dkt. # 52, p. 2.

to question Grant and Robinson.  Meakins detected the strong odor of fresh paint and when questioned about that, Grant told Meakins the truck had been painted 2–3 months prior.  Robinson also told the officers he had only been arrested for traffic violations, and contrary to what Grant had stated, Robinson indicated that he and Grant were relatives through Robinson's father, not mother. Meakins regarded this discrepancy as suspicious.  By this time the dispatcher had reported back that there were no warrants for Grant or Robinson.

At about 16 minutes, the dispatcher reported that Grant had a previous drug arrest and numerous aliases. When asked about the prior arrest, Grant denied that he had been arrested for drugs, but said that a friend with whom he had been riding was the one arrested for drugs. The dispatcher also told Meakins that Grant should have some identifying physical features, including a tattoo on his arm and a scar on his cheek.  Meakins confirmed that Grant had these features.   At this point however, Meakins was becoming increasingly suspicious that Grant was concealing his true identity.  To dispel his suspicions, Meakins asked Grant for his social security number, Grant did not produce a social security card and could not readily remember the number.  Grant did recite a number to Meakins, which was later confirmed to be his real social security number when his social security card was found in his wallet during the patdown search.

At 22 minutes, Meakins conducted a pat down search of Grant, discovering $5,019 in cash, including 4 tightly wound rolls of $1,000 each in Grant's cargo pockets.  Meakins then instructed Robinson to get out of the vehicle and performed a patdown search, discovering that Robinson had $821 in cash.  This contradicted Robinson's claim that he only had $120.

At approximately 29 minutes, Meakins began to search the vehicle based on the consent he received earlier from Grant.  The Government contends the delay between the initial stop and the initiation of the search was justified based on the following suspicious circumstances observed by

Meakins and Hinds:

1.    The men drove from South Carolina to South Texas to purchase a taco truck;

2.    The men's stories were inconsistent as to what side of the family they were related;

3.    Both men stated that they had only been arrested for traffic violations, but the dispatcher reported each had been arrested for a drug offense;

4.    Grant continuously yawned and stretched while speaking with the officers;

5.    Meakins noticed the smell of fresh paint near the cab and at the tailgate of the truck;

6.    Grant found it difficult to recite his social security number and claimed he did not have a social security card; and

7.    During a patdown search of the men, Grant was discovered to possess $5,019 in cash and Robinson $821, about which Robinson had lied.

Meakins manually searched the truck for approximately eight minutes. The result: "Nothing illegal was found and the deputies decided to take the vehicle to the station for a more thorough search."[5]   Meakins told the suspects that they wanted to take the vehicle back to the station to get a better look at it.  Although the audio is not completely clear, one suspect seems to express some opposition because you can hear Meakins respond that it is only a few miles down the road and it will not take long "if everything goes right."  At that point, Hinds handcuffed Grant and put him in the back of his patrol car.  Meakins explained that Hinds would be transporting Defendant in front, Robinson should follow Hinds, and Meakins would bring up the rear.  Robinson requested the return of his driver's license, but Meakins said he would hold onto it.  The traffic stop by the roadside lasted approximately 42 minutes before the vehicle was transported to the maintenance bay of the Beeville County Sheriff's Department.  Notably, Meakins' drug-sniffing canine was not deployed

---

[5]  Dkt. # 52, p. 4.

4

at the road-side scene.

All three vehicles proceeded to the Bee County Sheriff's maintenance bay in Beeville.  The drive to the maintenance bay took approximately 7–8 minutes.  Back at the bay, officers conducted an extensive search, including hoisting the vehicle up and removing panels.  During this search Grant was still handcuffed nearby, observing the search.  Meakins apparently discovered that Grant had been issued a social security card "by INS instead of SSA."[6]  It is unclear if the INS status of the card appeared on the face of the card or was reported as new information by the dispatcher.  Grant explained he was on a work release program when he lost his card, and that was the reason the replacement card was issued by INS.

The officers continued to notice the strong odor of paint inside the truck (consistent with Meakins and Grant's earlier conversation about the paint job several months prior).  Finally, Meakins observed something he had apparently missed during the earlier 8 minute roadside search: multiple screws missing on the rear interior panels of the cab behind the passenger seats.  Incidentally, Grant asked, during this second search and before the drug dog was employed, how much longer the deputies would take.  Meakins advised him that "the search would not last much longer."[7]  Also, at some point before the drug dog was employed, Meakins removed the handcuffs from Grant.  Meakins testified at that point he was satisfied that Grant was who he said he was, although it is unclear if Meakins obtained any new information that dispelled this suspicion.

Finally, Meakins called on Heidi to assist in the search approximately 96 minutes after first stopping the truck and approximately 45 minutes after arriving at the maintenance bay.  The dog immediately alerted the officers to the presence of narcotics.  At the 108 minute marker, Meakins

---

[6]  Dkt. # 52, p. 4.

[7]  *Id.* at p. 5.

advised Grant that he had probable cause to suspect that narcotics were concealed in the truck. The deputies removed the rear interior panels and found the following: (1) a trash bag and two smaller bundles containing 2.84 kilograms of cocaine powder and (2) a loaded .45-caliber handgun along with 14 rounds of ammunition. The officers arrested Grant and Robinson at approximately 110 minutes after the men were initially stopped, and advised them of their *Miranda* rights. Both defendants later provided video-recorded statements. During a strip-search at the Bee County Jail, Grant was found to have a small plastic bag containing cocaine powder concealed in his pants.

Defendant set forth five grounds for which he claims the evidence seized during the search of his vehicle should be suppressed: (1) no reasonable suspicion existed justifying the initiation of the traffic stop; (2) the detention of the Defendant exceeded the scope of the original justification for the traffic stop; (3) the detention amounted to arrest without probable cause; (4) Defendant did not consent to the search of his vehicle; and (5) Defendant's consent was not voluntary.

## Discussion

### A.    Initial Stop

Defendant contends that Meakins did not have reasonable suspicion justifying the initiation of the traffic stop. A traffic stop constitutes a seizure under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Routine traffic stops, being closer in nature to investigatory detentions rather than a full blown arrest, are governed by the principles set out in *Terry v. Ohio,* 392 U.S. 1 (1968). *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). The legality of a police investigatory stop under *Terry* is assessed in two parts: (1) whether the officer's action was justified at its inception, and (2) whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. *Terry*, 392 U.S. at 19–20; *Brigham*, 382 F.3d at 506.

6

For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred or is about to occur, before stopping the vehicle. *United States v. Breeland*, 53 F.3d 100, 102 (5th Cir. 1995). Reasonable suspicion exists when the officer can point to specific, articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. *Terry*, 392 U.S. at 21; *United States v. Santiago*, 310 F.3d 336, 340 (5th Cir. 2002). The existence of reasonable suspicion is based on the totality of the circumstances. *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006). The United States Supreme Court held that the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977).

The Government maintains that Meakins observed the truck cross the center line, swerving into the wrong lane of traffic in violation of Texas traffic laws. *See* TEX. TRANSP. CODE ANN. § 545.060(a) (Vernon 1999) (requiring a driver to "drive as nearly as practical entirely within a single lane; and may not move from the lane unless that movement can be made safely"). Although the testimony is conflicting,[8] the Court believes that Meakins had an objectively reasonable belief that he witnessed Defendant cross over the center line of the road. Meakins testified that he stopped the truck because he observed it swerve into the wrong lane after apparently following it for some distance. Meakins testimony supports the conclusion that he had probable cause to stop the

---

[8] The Government maintains that Defendant admitted to Deputy Hinds that he had "swerved out of his lane because he was watching girls," and that such admission was recorded on the patrol unit video. *See* Dkt. # 61, pp. 2, 6–7. Meakins also testified that he observed Defendant cross the center line. The Defendant, however, argues that in the video Meakins told Defendant he stopped him because he hit the outside line a few times. *See* Dkt. # 58, p. 6. The video does reflect that Meakins told Defendant he pulled him over for hitting the outside lines a few times, but whether it was the center line or the outside line, Defendant committed a traffic violation either way. Thus, this discrepancy is not relevant.

Defendant for violating the traffic law.  Further, the fact that Meakins may have initially been motivated to "observe the driver's driving habits" for the purpose of drug interdiction rather than enforcing traffic laws is of no consequence.  Officers are justified in making pre-textual stops so long as there was probable cause to believe that a traffic violation had occurred. *United States v. Causey*, 834 F.2d 1179, 1184 (5th Cir. 1987) (noting "so long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry").

The Defendant asserts that failing to maintain a single lane of traffic is not valid grounds for initiating a stop because "Texas courts have interpret[ed] this statute to mean that there will be no traffic violation if a motor vehicle operator drives his vehicle a few times over the white line dividing lanes of traffic going in the same direction or even cross[ing] the shoulder line as long as it was safe to do so."  Dkt. # 58, p. 6 (citing *Griffin v. State*, 54 S.W.3d 820, 823 (Tex. App.–Texarkana 2001)).  However, the Fifth Circuit in *United States v. Zucco* upheld the same traffic violation as sufficient grounds for making a traffic stop.  71 F.3d 188, 190 (5th Cir. 1995). The Court held that the traffic stop was valid because the defendant repeatedly veered onto the shoulder of the road, which "arguably was a violation" of a state statute requiring drivers to keep their vehicle within a single lane of traffic.  *Id*.  Although Defendant may not have been convicted for violating this traffic law, he was "arguably" in violation of the statute, creating probable cause to make the stop. *United States v. Santiago*, 310 F.3d 336, 341 (5th Cir. 2002).  Therefore, the Court finds that Meakins was justified in initiating the traffic stop based on the Defendant's failure to maintain a single lane of traffic.

### B.    Continued Detention

The continued detention of Defendant requires the court to review more closely the

limitations placed on *Terry* stops by the Supreme Court.  Generally, the "touchstone of Fourth Amendment analysis is reasonableness." *Ohio v. Robinette,* 519 U.S. 33, 39 (1996) (quoting *Florida v. Jimeno,* 500 U.S. 248, 250 (1991)).  When analyzing the reasonableness of a Fourth Amendment search or seizure, law enforcement interests must be weighed against an individual's right to be free from arbitrary intrusions by law enforcement. *Pennsylvania v. Mimms,* 434 U.S. 106, 109 (1977) (per curiam); *United States v. Brigham,* 382 F.3d 500, 507 (5th Cir. 2004).  The court must examine the totality of circumstances in objective terms; this often requires a fact-intensive inquiry. *Florida v. Royer,* 460 U.S. 491, 506 (1983).

As stated previously, traffic stops fall under the rubric of *Terry* stops because they are more akin to investigatory detentions rather than a full blown arrest.  In *Terry*, the Supreme Court carved out a narrow exception to the probable cause requirement of the Fourth Amendment, permitting police officers to "make limited intrusions on an individual's personal security based on less than probable cause" when they suspect criminal activity is occurring. *Michigan v. Summers*, 452 U.S. 692, 698 (1981).  By establishing this exception to the probable cause requirement, the Court recognized that certain important law enforcement interests, including ferreting out crime and the safety of officers, outweighed the brief, limited intrusion necessary to protect these interests. *Terry*, 392 U.S. at 30.  In any detention based on less than probable cause, the Supreme Court requires this court to balance the respective interests involved.  As the Supreme Court explained:

> We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.  When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause.

*United States v. Place*, 462 U.S. 696, 702 (1983).

Under the second prong of *Terry*, the court must determine whether the officer's actions subsequent to the stop were reasonably related in scope to the circumstances that justified the stop. *Terry*, 392 U.S. at 19–20; *Brigham*, 382 F.3d at 506.  As the Supreme Court observed, "[t]he manner in which the seizure  . . . [was] conducted is, of course, as vital a part of the inquiry as whether [it was] warranted at all."  *Place*, 462 U.S. at 708–09 (citing *Terry*, 392 U.S. at 28). "[T]he correct analysis requires district courts to consider the facts and circumstances of each case, giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances." *Brigham*, 382 F.3d at 507.  It is the government's burden to demonstrate that the seizure it seeks to justify on the basis of reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure. *Florida v. Royer*, 460 U.S. 491, 500 (1983). Several general principles enunciated by the Supreme Court guide this court's analysis in determining whether or not the officers' conduct in this case was reasonable in light of the developing circumstances.

In *Florida v. Royer*, officers approached a suspect at the airport on suspicion that he was trafficking drugs. *Id.* at 493.  The suspect produced his ticket and identification, which bore different names.  *Id.* at 493–94.  The officers explained they were narcotics investigators, and without returning the suspect's license and ticket, asked him to accompany them to a separate room.  *Id.* at 494.  Officers, without suspect's consent, retrieved suspect's checked luggage, and without an oral response to the request for consent, the suspect unlocked one of the suitcases in which marijuana was found. *Id.*

The Supreme Court determined that the officers' actions had exceeded the scope of a

permissible *Terry* stop, and that the respondent's consent was tainted by the illegal detention.  *Id.* at 507–08.  The Court found that while legitimate law enforcement interests warranted a limited intrusion based on reasonable suspicion, the "investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."  *Id.* at 500; *Brigham*, 382 F.3d at 507. Additionally, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500; *United States v. Santiago*, 310 F.3d 336, 341 (5th Cir. 2002).

In *United States v. Place*, a suspect was stopped at the Miami International Airport on suspicion of drug trafficking.  462 U.S. 696, 698 (1983).  Officers approached the suspect and requested identification and consent to search his checked luggage.  *Id.*  The suspect consented; however, the officers decided not to search at that time because the airplane was about to depart. *Id.*  The officers then notified DEA agents at La Guardia Airport in New York about their suspicions and the suspect's arrival.  Upon his arrival in New York, the suspect was approached by the DEA agents.  At this point, the suspect refused consent to any search. *Id.* at 699.  After 90 minutes of detention, the agents employed the drug dogs on the luggage, at which point the dog alerted to the presence of narcotics.  *Id.*

The Court held that the length of the detention alone made the seizure unreasonable in the absence of probable cause. *Id.* at 709.  The Court recognized that longer stops may be reasonable, but "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion."  *Id.*  Further, when assessing the reasonableness of a lengthy detention, an officer's conduct in pursuing the investigation diligently must also be taken into account. *Brigham*, 382 F.3d at 511 (citing *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988) ("[T]he most important

11

factor [for the courts to consider] is whether the police detained [the defendant] to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference.")). The Court concluded the officers' actions, or rather inaction, exceeded the permissible limits of a *Terry* investigative stop because the officers failed to employ the drug dog in a timely fashion. *Place*, 462 U.S. at 709.

In *United States v. Sharpe*, a DEA agent noticed an overloaded truck driving in tandem with a Pontiac in an area under surveillance for drug trafficking. 470 U.S. 654, 677 (1985). The agent notified local authorities. When they attempted to stop the vehicles, the Pontiac pulled over to the side of the road, but the truck continued on. *Id.* at 678. Eventually the local authority was able to pull the truck over further down the road. The state officer held the truck driver until the DEA agent arrived approximately 15 minutes later. *Id.* at 678–79. Upon the DEA agent's arrival, he confirmed that the truck was overloaded and smelled of marijuana. *Id.* at 679. Sharpe contended the officers has exceeded the limits of *Terry* by holding him at the roadside for 20 minutes while the DEA agent went to search the truck. *Id.* at 680.

The Court reiterated its position that it would not create rigid time limitations on *Terry* stops. *Id.* at 686; *Brigham*, 382 F.3d at 511 (noting there is "no constitutional stopwatch on traffic stops"). Instead, the proper focus in assessing whether a detention has exceeded the scope of *Terry* is to examine "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 686. A court should not simply question "whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Id.* at 687; *Brigham*, 382 F.3d at 511–12. Ultimately, the Court concluded that the 20 minute detention was not unreasonable. *Sharpe*, 470 U.S. at 688. The Court found no evidence that the officers were

dilatory in their investigation, and the delay was primarily attributable to the suspect's evasive actions. *Id.* at 687-88.

Following the principles established in the *Royer*/*Place*/*Sharpe* trilogy, an officer acts reasonably, within the bounds of *Terry*, when he diligently pursues a course of investigation, using the least intrusive means reasonably available to quickly confirm or dispel his suspicions, that does not unnecessarily prolong a detention based solely on reasonable suspicion.  Guided by these principles, the primary question facing this court is whether the officers' actions, after legitimately stopping Defendant, were reasonably related to dispelling the reasonable suspicion that developed during the stop in a diligent manner given the resources available to him.  The court finds that under the present facts the officers exceeded the limits of a valid *Terry* stop.

Analyzing the facts in this case, a police officer may permissibly examine the driver's license, insurance, and registration, run a computer check thereon and issue a citation. *Brigham*, 382 F.3d at 507–08.  An officer may also ask the driver about the purpose and itinerary of his trip.  *Id.* at 508.  Normally, once the computer check comes back clean, any continued questioning thereafter unconstitutionally prolongs the detention. *United States v. Dortch*, 199 F.3d 193, 199 (5th Cir. 1999).  However, if additional reasonable suspicion arises in the course of the stop and before the initial purpose the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed.  *Brigham*, 382 F.3d at 507.  Meakins' course of conduct in running computer checks on the suspects' driver's licenses and questioning them about the nature of their trip was reasonable.

While the computer check was being conducted, Meakins had the following information regarding Defendant and his passenger: (1) the men were traveling on a known drug corridor from out of state; (2) the men gave Meakins an implausible story about coming to Texas to purchase a

taco truck; (3) the men's stories were inconsistent as to what side of the family they were related on; (4) both men appeared visibly nervous; (5) Meakins noticed the smell of fresh paint which is often indicative of an attempt to mask the odor of narcotics.  Therefore, Meakins was able to articulate several specific reasons, amounting to reasonable suspicion, that permitted him to continue to hold the Defendant beyond the time that the dispatcher came back with the results of the computer check.

The results of the computer check created further suspicion when Meakins confirmed that the men had lied about their arrest records and both had a previous drug arrest.  When Grant found it difficult to recite his social security number and claimed he did not have a social security card, this led Meakins to believe Grant was concealing his identity.  The dispatcher reported that Grant has numerous aliases, which served to confirm Meakins' suspicions that Defendant may be providing a false identity and/or the men were carrying illegal contraband.  Under *Brigham*, these additional facts justified Meakins further detention of Defendant.

At this point, Meakins conducted a patdown search of Defendant and Robinson and discovered the large quantities of cash each man had on their person.  Robinson had lied to the officers about the amount of cash he possessed.  This fact heightened Meakins' suspicions that drug activity might be afoot. Meakins also had what he believed to be general consent to search the vehicle.  After 29 minutes into the stop and about 24 minutes after the consent was given, Meakins manually searched the interior and exterior of the vehicle for 8 minutes.  However, this initial search did not confirm or dispel his suspicions that drug activity was taking place, as the search turned up no illegal contraband and no further clues that the Defendant was carrying narcotics. Further, the facts supporting Meakins' original reasonable suspicion dissipated over the length of the seizure as information continued to come forth confirming Defendant's identity and after his 8 minute manual search yielded no illegal contraband. *See United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir.

14

1993) (explaining when weapons possession is suspected and after conducting a pat-down frisk yielding no weapons, "at that point suspicion of weapons possession has evaporated and no longer justifies further detention").

Meakins had a trained narcotics dog in his patrol car during the whole stop, which begs the question why did Meakins not use the very efficient, very available drug dog sooner if he suspected narcotics activity? During the suppression hearing, the Court specifically questioned Meakins about his decision not to promptly use the drug dog, first on the roadside and then at the maintenance bay. During the first exchange, Meakins indicated he was not comfortable using the dog at the traffic stop because of heavy traffic and the fact the dog was not "patrol certified."[9]  The court next questioned Meakins about his decision not to employ the dog as soon as they arrived at the maintenance bay, and Meakins hesitantly responded the thought did not occur to him.  Eventually after further questioning from the court, Meakins explained that he was once instructed in a training class that he should use the dog as a last resort.  He testified that the instructor explained it was better to use the dog last for fear of a false negative as well as the extra effort it takes at trial to prove up the qualifications and record of a drug dog and his handler.  Meakins further stated he has since reformed his practices and no longer adheres to this rationale.

Several Supreme Court and Fifth Circuit cases instruct that employing a drug dog promptly is generally the most efficient and least intrusive means of investigating hidden narcotics.  In the *Place* case discussed previously, the Supreme Court criticized officers for not employing the drug dog in a timely fashion when the suspect arrived at the airport.  *United States v. Place*, 462 U.S. 696, 709 (1983) (explaining "the New York agents knew the time of [defendant's] scheduled arrival at La Guardia, had ample time to arrange for their additional investigation at that location, and thereby

---

[9]  Meakins testified that the dog was not trained in pursuing fleeing suspects.

could have minimized the intrusion on [defendant's] Fourth amendment interests").  This decision alone unnecessarily prolonged the detention and led the Court to find that the officers were not diligently pursuing the investigation in a way that would confirm or dispel their suspicions in the shortest period of time with minimal interference.  Also the *Royer* Court discussed the use of trained drug dogs.  The Court indicated that employing a trained narcotics dog, a more expeditious and less intrusive means of searching luggage, may have avoided the problems associated with that airport seizure.  *Florida v. Royer*, 460 U.S. 491, 505–06 (1983).  The Court stated: "There is no indication here that this means was not feasible and available.  If it had been used, [defendant] and his luggage could have been momentarily detained while this investigative procedure was carried out." *Id.*

The Fifth Circuit came to a similar conclusion in *United States v. Dortch*, holding it was unreasonable for an officer to continue to detain a suspect to wait for a dog search after the computer check came back clean.  *United States v. Dortch*, 199 F.3d 193, 199 (5th Cir. 1999).  One factor making this particular stop unreasonable was the officer's failure to timely request a canine unit.  "The delay for the canine unit to arrive cannot be attributed to [defendant].  In fact, it was approximately 9–10 minutes into the stop before the officers first requested that the dispatcher send the canine unit.  The officers offered no justification for this delay . . .  It is therefore reasonable to expect that they would have anticipated needing a canine unit." *Id.* at 200.

Similarly, there is no reasonable explanation for Meakins' failure to run the drug dog either on the highway or immediately upon arrival at the maintenance bay.  As highlighted in these cases, employing the dog at the roadside would have avoided the further substantial intrusion on Defendant's personal interests.  Running the dog promptly would have avoided not only the lengthy detention, but also handcuffing the Defendant for over 45 minutes and transporting him and his vehicle to the police maintenance bay.

From an officer's point of view, his reasons for not promptly employing the dog may absolutely be important considerations, but from a constitutional point of view, the court must consider whether there was a legitimate government interest in extending the length of the detention by not promptly employing the drug dog sufficient to outweigh the extensive intrusion on Defendant's personal interest. The court finds that the officer's decision not to employ the drug dog and his reasoning for not doing so are inadequate to justify detaining a suspect for over an hour and a half, based solely on reasonable suspicion, when the drug dog was available at all times to promptly and efficiently detect any illegal contraband. The Court does not hold that this detention was per se too long, or that a dog must be employed immediately, or that the dog must be employed in any particular sequence. While a dog is an efficient means to investigate the presence of drugs, it "need not be pursued to the exclusion of, or in particular sequence with, other efficient means." *United States v. Brigham*, 382 F.3d 500, 511 (5th Cir. 2004).

However, the Court does hold that an officer cannot delay in employing the dog based on his belief that the dog will not alert or based on some notion that the government will incur additional burden in proving up the dog's history. The choice to not utilize the drug dog sooner undoubtedly prolonged the Defendant's detention unnecessarily and intruded on his personal liberty to an extent that is not supportable on reasonable suspicion alone. *See United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993) ("[D]etention . . . is the evil at which *Terry*'s second prong is aimed."). Although the court credits these officers for following their instincts and eventually discovering the drugs, the court considers Meakins' actions and decisions unreasonable based on the totality of the circumstances.[10] This conclusion is further supported by the fact that Deputy Meakins himself no

---

[10]  The Government concedes that "[t]he employment of the canine should have occurred much sooner than when it happened, however the dog was not trained to find firearms and money, and a failure to alert would not have dispelled the suspicion concerning Grant's

longer believes that employing the drug dog as a last resort is a reasonable method of investigation.

### C.    Probable Cause

Probable cause and consent are alternative grounds justifying warrantless vehicle searches. *United States v. Sutton*, 850 F.2d 1083, 1085 (5th Cir. 1988). The government does not contend that the officers had probable cause prior to the dog alert; however, for the sake of completeness the Court will address whether probable cause existed justifying the extended search and detention. Probable cause exists where the facts and circumstances within the officer's knowledge are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been or is being committed. *United States v. Mendez*, 27 F.3d 126, 129 (5th Cir. 1994). In determining whether an officer has probable cause, the court must consider the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230 (1983); *United States v. Edwards*, 577 F.2d 883, 885 (5th Cir. 1978) (en banc). Because of the highly fact-specific nature of the probable cause determination, no single precedent involves the specific facts in this case; however several Fifth Circuit cases will help guide this Court's analysis because they involve similar suspicious circumstances. *See United States v. Reed*, 882 F.2d 147, 149 (5th Cir. 1989) ("The factors relevant to probable cause are not technical ones, but rather factual and practical ones of everyday life on which reasonable and prudent persons, not legal technicians, act.").

In *United States v. Zukas*, the following facts and circumstances were considered: (1) flying a small aircraft with extended-range fuel tanks, tinted windows, and high security locks; (2) aircraft was owned by a company known for leasing to drug smugglers; (3) the defendant paid cash for fuel

---

identity." Dkt. # 61, p. 13  The Court is not convinced that this was the officer's real reason for not employing the dog sooner, but if Meakins was primarily concerned with the true identity of Grant, all subsequent dispatcher reports confirming or dispelling his suspicion could have been received roadside and transporting the vehicle to the maintenance bay would have been unnecessary.

and hotel; (4) the aircraft was flown from and was flying to known drug trafficking areas; (5) the passenger appeared nervous and carried a large amount of cash; and (6) the defendant had prior drug smuggling arrests.  843 F.2d 179, 182–83 (5th Cir. 1988).  After considering these facts in the aggregate, the Fifth Circuit concluded "[t]he suspicion did not rise to the level of probable cause." *Id.* at 183. *See also United States v. Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003) (finding the facts that defendant appeared nervous, was traveling on a known drug corridor and was 500 miles away from the road leading to his claimed destination, the defendant lied about why he did not have identification, and had prior drug arrests amounted to reasonable suspicion, not probable cause); *United States v. Jones*, 234 F.3d 234, 241–42 (5th Cir. 2000) (finding that discrepancies between the driver and passenger's explanations about the itinerary of their trip, the fact that neither occupant of the vehicle was listed as an authorized driver of the rented vehicle, and driver's admission that he had previously been arrested for drug possession did not support a finding of reasonable suspicion).

In *United States v. Kye Soo Lee*, a motorist driving a rental truck was stopped for a traffic violation.  962 F.2d 430, 431 (5th Cir. 1992).  The driver consented to a search of the vehicle, at which point the officer found what appeared to be counterfeit merchandise.  *Id.* at 432.  At the roadside, specific facts emerged that the Fifth Circuit determined amounted to probable cause: (1) the driver was wearing a "Gucci" baseball hat identical to those found in the back; (2) the driver and passenger had lied about their knowledge of the cargo and their ability to gain access to it; (3) neither person could produce any paperwork demonstrating any lawful connection to the merchandise; and (4) the packaging was haphazard and inconsistent with packaging of designer merchandise.  *Id.* at 434.  Further, the driver and passenger gave inconsistent stories about who had rented the truck, the passenger was in possession of $8,900.26, and the driver was unable to produce

19

any identification. *Id.* at 432.  The Court held that the officers reasonable suspicion ripened into probable cause  when the "roadside search revealed 'probably counterfeit' merchandise." *Id.* at 439. Despite the inconsistent stories, lack of identification, and the large amount of cash, it was not until the discovery of the highly suspicious merchandise that probable cause emerged.

Based on the determinative facts of these cases, the Court finds Deputy Meakins did not have probable cause prior to the dog alert to justify the extended search and detention in this case. The particular facts in *Kye Soo Lee* are similar with the facts in this case.  For instance, there was a large amount of money, inconsistent stories, and lack of identification; however, probable cause did not arise until there was some more direct proof of illegal activity.  Similarly, the money, inconsistent stories, and suspicious identification in this case only supports reasonable suspicion, but probable cause did not arise until the dog alerted back at the maintenance bay.  Meakins did not discover any illegal contraband or any indication of the existence or whereabouts of any illegal contraband on the roadside similar to that found in *Kye Soo Lee.  See also United States v. Harlan*, 35 F.3d 176, 179 (5th Cir.1994) (finding probable cause based in part on a "visible large bulge," presumed to be cocaine, in the suspect's jacket); *United States v. Piaget*, 915 F.2d 138, 140 (5th Cir.1990) (finding probable cause based in part on the transfer between the suspects of a gray canvas bag which was presumed to contain narcotics); *United States v. Adcock*, 756 F.2d 346, 347 (5th Cir.1985) (finding probable cause based in part on cocaine found on a person who had just exited the suspect's house); *United States v. Antone*, 753 F.2d 1301, 1304 (5th Cir.1985) (finding probable cause based in part on an informant's tip concerning the location of marijuana and the smell of marijuana from a suspect's garage); *United States v. Willis*, 759 F.2d 1486, 1495 (5th Cir.1985) (finding probable caused based, in part, on stuffed duffel bags, presumed to contain cocaine, in the passenger area of a private luxury passenger plane).

### D.     Consent

The Court must consider the effect of Defendant's consent to search the vehicle on the overall validity of the *Terry* stop.  The Defendant argues his consent was limited to the bed of the truck.   A consensual search is a well-settled exception to the warrant or probable cause requirements.  *United States v. Navarro*, 169 F.3d 228, 231 (5th Cir. 1999).  In determining whether a search based upon consent is valid, the government must prove that the consent was voluntary. *United States v. Dortch*, 199 F.3d 193, 201 (5th Cir. 1999).  The consent in this case occurred prior to the time the dispatcher completed the computer check, so the court does not have to consider the extra factors related to a tainted consent based on a prior Fourth Amendment violation. *See United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993) ("Where consent is preceded by a Fourth Amendment violation, the government has a heavier burden of proving consent."(citations omitted)). The voluntariness of consent is a "question of fact to be determined from the totality of all the circumstances."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).   In determining whether a consent to search is voluntary, the Fifth Circuit reviews several factors, none of which is independently dispositive.  *United States v. Olivier-Becerril*, 861 F.2d 424, 425 (5th Cir. 1988).  The factors include: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.  *Id.* at 426.

Reviewing these factors, at the time the Defendant gave his consent, he was willingly cooperating with Meakins.  The consent occurred within five minutes of the stop and was not obtained as a result of coercion, duress or any other improper means which might cast doubt on its voluntariness.   Although Meakins did not inform Grant of his right to refuse consent, all the

21

remaining relevant factors indicate that the Defendant gave consent to search voluntarily and freely.

However, Defendant argues his consent to search was limited in scope to the bed of the truck.  The scope of consent is analyzed in terms of what a reasonable person would have understood by the exchange between the officer and the suspect.  *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).  Defendant, as the individual with knowledge of the contents of his vehicle, is responsible for limiting his consent to search the vehicle.  *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 667 (5th Cir. 2003).  Although objective reasonableness is a question of law, the factual circumstances are highly relevant when determining what the reasonable person would have believed to be the outer bounds of the consent that was given.  *Id.*  The Fifth Circuit has held that a request to take a "look in" the vehicle is the equivalent of a request for a general consent to search the entire vehicle.  *Id.* at 667–68.  Where a motorist does not limit the scope of the search and does not object when the search exceeds what he later claims was a more limited consent, an officer is justified in searching the entire vehicle.  *Id.* at 667.  Once consent to search is given it may be revoked or withdrawn.  *United States v. Ho*, 94 F.3d 932, 935 (5th Cir. 1996).  If a person effectively withdraws consent, then the search must stop.  *Linn v. Chivatero*, 714 F.2d 1278, 1288 (5th Cir. 1983).

Meakins testified the following exchange, at approximately 5 minutes into the stop, formed the entire basis for his belief that he had general consent to search the vehicle:  both men were still standing at the rear of the truck when Meakins asked Grant "what do you have in the back of there," motioning to the bed of the truck.  Grant responded that he had nothing back there and moved to open the tailgate for the officer to look.  Meakins said "that's alright, that's alright," indicating he did not want to look at that time. Meakins asked if it was "empty," and Grant said he had his clothes, toothpaste, and stuff back there.  Grant told Meakins "you can go ahead and look back there."

Based on this exchange, Meakins received "what he thought" to be consent to search verbally from Defendant. Dkt # 61, p. 2. *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 667 (5th Cir. 2003) ("'The question [of scope] is *not* to be determined on the basis of the subjective intentions of the consenting party or the subjective interpretation of the searching officer.'" (quoting Wayne R. LaFave, SEARCH AND SEIZURE § 8.1(c) (3d ed. 1996 & Supp.2003))). Meakins testified that this was the only consent he received, and the only consent he used to form the basis of his belief that he had general consent. Despite Meakins' subjective belief, the court finds, when viewing this exchange in objective terms, the consent to search given by the Defendant was limited in scope to the bed of the truck. This conclusion is supported by the fact that Meakins and the Defendant both used the word "back" in the request to search and in the consent given. The Fifth Circuit has held that a request to "look through" or "look in" contemplates a general consent; however, given the positioning of Meakins and the Defendant at the rear of the truck and their reference to the bed of the truck, the court concludes that their exchange was not as broad as a "look through" or "look in" consent. *Id.* Further, the Defendant, at least, clearly indicated that he was speaking about the bed of the truck as demonstrated by his walking to the tailgate and attempting to open it and let the officer look inside. At that point, Meakins declined to search and never requested consent again. The court finds the Defendant's consent to search was limited in scope to the bed of the truck, and therefore, any subsequent searches conducted by Meakins required him to gain further consent.[11]

---

[11] Although the court believes it has stated adequate grounds for granting the motion to suppress, if Defendant's consent was interpreted as general consent to search the whole vehicle, this fact does not save the illegal detention. The court will not express an opinion on whether this *Terry* stop grew into a full blown arrest requiring probable cause, but the court does believe that the oral consent given by Defendant at five minutes into the stop does not justify a two hour detention. *See United States v. Ibarra*, 955 F.2d 1405, 1411 (10th Cir. 1992) (holding "that because an illegal seizure occurred following the initial consent, that consent does not 'continue' to justify the second search"). Further, during the initial 8 minute search Defendant was handcuffed in the back of the patrol car and his paperwork had not been returned to him, thus the

Defendant requests that all the evidence obtained as a result of the illegal search and seizure be suppressed under the exclusionary rule established by the Supreme Court. *Weeks v. United States*, 232 U.S. 383 (1914). The exclusionary rule is a jurisprudential construct designed for the purpose of deterring "future unlawful police conduct and thereby effectuat[ing] the guarantee of the Fourth Amendment against unreasonable searches and seizures[.]" *United States v. Calandra*, 414 U.S. 338, 347 (1974). Under the exclusionary rule, which "was adopted to effectuate the Fourth Amendment right of all citizens, . . . evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *Id.* The rule excludes not only the illegally obtained evidence itself, but also other incriminating evidence derived from that primary evidence, or "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984). The court has already found that the police conduct in this case violated the Defendant's Fourth Amendment rights. The invocation of the exclusionary rule, in this case, would serve its intended purpose in deterring similar police conduct; therefore, all evidence obtained as a result of the illegal search and seizure should be suppressed.

### Conclusion

What began as a valid routine traffic stop ended as a violation of the Defendant's Fourth Amendment right to be free from an unreasonable search and seizure. While additional reasonable suspicion formed during the stop and Meakins did obtain limited consent to search, Deputy Meakins' subsequent actions did not conform to the limitations placed on stops based solely on

---

court does not believe the Defendant had the option at that point to withdraw or revoke his consent. *See Florida v. Royer*, 460 U.S. 491, 503 n.9 (1983) (noting that continuing to hold a person's paperwork is indicative of non-consensual encounter). The same holds true for the officer's request to accompany him to the police maintenance bay for further searching. *See United States v. Heath*, 259 F.3d 522, 531 (6th Cir. 2001) (finding that *Terry* detentions are limited in scope and "absent the requisite probable cause, an investigative stop must be confined to the site of the initial inquiry").

reasonable suspicion.  Meakins did not act diligently and reasonably to confirm or dispel his suspicions and unduly delayed the investigation by not employing the dog sooner.  Additionally, Meakins exceeded the scope of the consent given by the Defendant when he searched the entire vehicle.

For these reasons, the Defendant's Motion to Suppress is GRANTED.

It is so ORDERED.

Signed this 28th day of February, 2007.


JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE